UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)

In re:                                                          CASE NO. 21-12188-PDR

NO RUST REBAR, INC.,

     Debtor

_____/

SONYA S. SLOTT, Trustee,                              ADV. CASE NO.

     Plaintiff,

v.

GRIECO CHEVROLET FORT LAUDERDALE LLC,

     Defendant.

_____/

## ADVERSARY COMPLAINT

The Plaintiff, SONYA SALKIN SLOTT, Chapter 7 trustee of the estate of debtor No Rust Rebar, Inc. ("Debtor"), files this Adversary Complaint against the Defendant, GRIECO CHEVROLET FORT LAUDERDALE LLC ("Grieco" or "Defendant"), and says:

## THE PARTIES, JURISDICTION, AND VENUE

1.      On March 5, 2021 ("Petition Date"), the Debtor filed a voluntary petition ("Petition") for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") [ECF # 1] initiating the above-captioned bankruptcy case ("Bankruptcy Case") before the above-captioned bankruptcy court (the "Court").

2.      On May 23, 2022, the Court entered an order converting this case from a Chapter 11 case to a Chapter 7 [ECF #193].

3.      The next day, Plaintiff Sonya Salkin Slott (the "Trustee" or "Plaintiff") was

1

appointed Chapter 7 trustee [ECF #194], and she files this action in her capcity as the duly appointed and acting trustee of the bankruptcy estate of the Debtor with standing to assert and prosecute the claim set forth herein.

4.      The Defenedant is a Florida limited liability company, with its principal place of business located at 1300 North Federal Highway, Fort Lauderdale, Florida 33304.

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334, and the general order of reference entered by the United States District Court for the Southern District of Florida on or about March 27, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).   The Plaintiff consents to the entry of orders and judgment by the Bankruptcy Court. This adversary proceeding is brought pursuant to FRBP 7001(4)

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

7.      All conditions precedent to the filing of this action have been performed, waived or satisfied.

## FACTS COMMON TO ALL COUNTS

### A.      Procedural Background

8.      On July 22, 2022, the Trustee filed her *Motion for the Entry of an Order (1) Approving Bidding Procedures, (2) Approving the Form and Manner of Notice of Sale, (3) Scheduling a Final Hearing to Approve Sale, and (4) Approving the Sale of the Real Property, Free and Clear of Liens, Claims and Encumbrances* (the "Sale Procedures Motion") [ECF #219]. The general purpose of the Sale Procedures Motion to initiate the process of selling the premises of the Debtor's former business operations, 2681 NE 4th Ave, Pompano Beach, FL 33064 (the "Premises").

9.      On August 23, 2022, the Court entered an Order Granting the Sale Procedures Motion (the "Sale Procedures Order") [ECF #258].

10.     On September 21, 2022, the Trustee filed her *Supplement to the Sale Procedures Motion* ("Supplement") [ECF #286].

11.     On October 3, 2022, the Trustee filed a *Motion to Amend Sale Procedures Order* to extend auction and related deadlines by two weeks [ECF #295] which the Court granted that same day [ECF #299].

12.     Pursuant to all of the foregoing, on October 18, 2022, the Trustee entered into an Asset Purchase Agreement (the "APA") with Grieco, a copy of which is attached as **Exhibit "A".**

13.     On October 18, 2022, the Trustee filed her *Expedited Motion To Modify Order Granting Motion For The Entry Of An Order (1) Approving Bidding Procedures, (2) Approving Manner Of Notice Of Sale, (3) Scheduling A Final Hearing, And (4) Approving The Sale Of Real Property Free And Clear Of Liens, Claims And Encumbrances* [ECF #313] (the "Grieco Sale Motion"), which attached the APA as an exhibit.

14.     Under the terms of the APA and Grieco Sale Motion, among other things, Grieco was to serve as a stalking horse bidder for a bankruptcy auction sale to be conducted on October 26, 2022 (the "Auction"), with a sale hearing before the Court to confirm and approve the results of the Auction scheduled for October 27, 2022 (the "Sale Hearing"). Grieco's stalking horse bid was $3,000,000.00, plus a 6% buyer's premium ($180,000.00), for a total due to the estate from Grieco of $3,180,000.00, *if* no other bidding occurred.

15.     In connection with the APA, on October 18, 2022, Grieco wired a $100,000.00 deposit (the "Initial Deposit") to the trust account of Dunn Law, P.A., the Trustee's closing

agent.

16.     On October 20, 2022, the Court held a hearing on approval of Grieco as the stalking horse bidder where the stalking horse contract was approved.

17.     On the next day, the Court entered its Order Granting the Grieco Sale Motion (ECF #319).

18.     The Auction took place as scheduled on October 26, 2022. No other bidder appeared to overbid the stalking horse bid of Grieco.  As such, upon the conclusion of the Auction, the Trustee declared Grieco the successful bidder.

19.     Pursuant to §5.2 of the APA, once Grieco was deemed the successful bidder at the Auction, Grieco was required to make a supplemental deposit within 24 hours of the conclusion of the Auction such that the supplemented deposit is equal to 10% of the Purchase Price including the Buyer's Premium (as those terms are defined in the APA) (the "Supplemental Deposit"). Since the total Purchase Price included the Buyer's Premium, a Supplemental Deposit of $218,000.00 was due. Pursuant to §5.2 of the APA, the Initial Deposit and Supplemental Deposit were collectively defined as "the Deposit."

20.     Grieco failed to post the Supplemental Deposit within twenty-four hours of the conclusion of the Auction.

21.     The Sale Hearing occurred as scheduled on October 27, 2022, at 2:00pm. Grieco did not appear at the Sale Hearing.

22.     Instead, just prior to the Sale Hearing (at approximately 12:10pm on October 27, 2022), Grieco (through counsel) sent a notice by email purporting to terminate the APA (the "Notice"). The Trustee filed the Notice with the Court prior to the Sale Hearing [ECF #323], and orally addressed the issue to the Court at the Sale Hearing.

23.    At the Sale Hearing, the Court approved the winning bid of Grieco, and the next day (October 28, 2022) entered its *Order Approving Sale Of Real Property Free And Clear Of Liens, Claims And Interests* [ECF #325] (the "Sale Approval Order") to that effect.

24.    The Sale Approval Order was not appealed by any party, and is now a final order of the Court.

25.    Pursuant to §10.1 of the APA, the closing date as defined in the APA was to be within 10 calendar days of the Sale Approval Order becoming final.

26.    The closing date has since passed and Grieco has continued to refuse to close the transaction within the timeframe required by §10.1 of the APA.

27.    Similiarly, Grieco has continued to refuse to pay the Trustee the Supplemental Deposit as required by §5.2 of the APA which has been due since 24 houts after Grieco was deemed the Succesful Buyer at the Auction.

## COUNT I

## Breach of Contract

28.    The Trustee realleges paragraphs 1 through 27 above.

29.    The APA is a lawful contract between the Trustee and Grieco, as determined by the Sale Approval Order.

30.    Grieco's failure to close the transaction contemplated by the APA constitutes a default by Grieco under §14.1 of the APA. Accordingly, Grieco is in breach of its obligations under the APA.

31.    Grieco's failure to pay the Supplemental Deposit portion of the Deposit is an additional breach of the APA.

32.     Under §14.1 of the APA, the Trustee's remedy for such breaches is retention of the Deposit, which is defined in §5.2 of the APA to be the Initial Deposit ($100,000.00, and already in the possession of the Trustee) *and* the Supplemental Deposit ($218,000.00, which remains unpaid by Grieco).

33.     Accordingly, as a result of said breaches of the APA by Grieco, the Trustee is entitled to (i) retain the $100,000.00 Initial Deposit and (ii) a judgment in the amount of $218,000.00 against Grieco, which sum represents the Supplemental Deposit which remains wrongfully unpaid by Grieco.

WHEREFORE, the Trustee demands the entry of a judgment against the Defendant and in favor of the Estate (i) in the amount of the Supplemental Deposit, $218,000.00, and (ii) awarding possession of the Initial Deposit, $100,000.00, to the Estate, and (iii) for any other relief the Court deems appropriate.

Respectfully submitted this 20th day of December 2022.

The Salkin Law Firm, P.A.
P.O. Box 15580
Plantation, FL 33318
954-423-4469

By: /s/ Mark Bonacquisti, Esq.
       Mark Bonacquisti, Esq.
       FBN 0703257
       mark@msbankrupt.com

By: /s/ Zachary Malnik, Esq.
       Zachary Malnik, Esq.
       FBN 1010272
       zachary@msbankrupt.com

# EXHIBIT A

### ASSET PURCHASE AGREEMENT

### BETWEEN

### SONYA S. SLOTT, AS CHAPTER 7 TRUSTEE FOR
### NO RUST REBAR, INC

### as Seller

### AND

Grieco Chevrolet Fort Lauderdale LLC, a Florida Limited Liability Company

### as Buyer

Property:  2681 NE 4th Avenue, Pompano Beach, Florida 33064

Dated as of: October  18 , 2022

JT:10/18/22

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of the 18th day of October 2022, between SONYA S. SLOTT, not individually but as the Chapter 7 Trustee of No Rust Rebar, Inc. (the "**Trustee**" or the "**Seller**"), and ___Grieco Chevrolet Fort Lauderdale LLC___ , a Florida Limited Liability Company (the "**Buyer**"), recites and provides:

## RECITALS

Green Tech Development LLC ("**Green Tech**") owns the real property located at 2681 NE 4th Avenue, Pompano Beach, Florida 33064, which real property is described on Exhibit A hereto, together with all improvements thereon and appurtenances thereunto belonging (collectively, the "**Real Property**").

A voluntary petition for relief under Chapter 11 Subchapter V, Title 11 of the United States Code (the "**Bankruptcy Code**") was filed by the No Rust Rebar, Inc. ("**Debtor**") in the United States Bankruptcy Court for the Southern District of Florida (the "**Bankruptcy Court**") on March 5, 2021. Thereafter, the Debtor's case was converted to one under Chapter 7 of the Bankruptcy Code on May 23, 2022. Seller was then appointed as the Chapter 7 trustee for the Debtor. The Debtor's case is pending in the Bankruptcy Court as Case No. 21-12188-PDR (the "**Bankruptcy Case**"). The bankruptcy estate of the Debtor is referred to herein as the "**Estate**".

Both prior to, and during, the Bankruptcy Case, Debtor asserted rights in the Real Property as a result of a disputed option agreement to purchase the Real Property ("**Estate's Interest**"). After the conversion of the Bankruptcy Case to Chapter 7, those asserted rights vested in the Trustee.

Green Tech has consented and agreed to allow the Estate and Trustee to list, market, and sell its legal interest in the Real Property ("**Green Tech's Interest**").

On July 22, 2022, the Trustee filed her Motion for the Entry of an Order (1) Approving Bidding Procedures, (2) Approving the Form and Manner of Notice of Sale, (3) Scheduling a Final Hearing to Approve Sale, and (4) Approving the Sale of the Real Property, Free and Clear of Liens, Claims and Encumbrances (the "**Sale Procedures Motion**") [ECF No. 219].

On August 23, 2022, the Court entered an Order Granting the Sale Procedures Motion (the "**Sale Procedures Order**") [ECF No. 258].

On September 21, 2022, the Trustee filed her Supplement to the Sale Procedures Motion ("**Supplement**") [ECF No. 286] where the Trustee further outlines the contemplated sale of the Estate's and Green Tech's Interests in the Real Property pursuant to Section 363 of the Bankruptcy Code including Green Tech's consent to the sale.

Seller believes that it is in the best interests of the Estate to sell the Assets (defined below) to Buyer, and Buyer wishes to purchase the Assets from Seller, all subject to the approval of the Bankruptcy Court and as more particularly provided below.

1

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows.

1.     Court Approval.  The parties' respective obligations to purchase and sell the Assets pursuant to this Agreement are subject to Bankruptcy Court approval after notice and a hearing, subject to higher and better offers, and the provisions, requirements and limitations of the Sale Order (defined below).

2.     Sale and Purchase of Property.  Subject to the terms and conditions of this Agreement and the Sale Order, and subject in all events to the approval of the Bankruptcy Court, on the Closing Date (defined below), Seller shall sell, assign, transfer, convey and deliver, or cause to be sold, assigned, transferred, conveyed and delivered to Buyer, and Buyer shall purchase and acquire from Seller, Seller's right, title and interest in and to the following (collectively, the "**Assets**"):

> 2.1    the Real Property

3.     Conveyance of Property.  Subject to and in accordance with the provisions of this Agreement and the Sale Order, and subject to approval of the Bankruptcy Court, Seller shall execute and deliver to Buyer on the Closing Date the following instruments pursuant to which Seller shall sell, assign, transfer, convey and deliver the Assets to Buyer on an AS-IS, WHERE-IS BASIS, WITHOUT REPRESENTATIONS OR WARRANTIES:

> 3.1    Trustee's Quitclaim Deed (the "**Trustee's Deed**") conveying the Real Property to Buyer which shall be free and clear of any and all encumbrances and restrictions in accordance with section 363 (b) and (f) of the Bankruptcy Code with such liens to attach to the proceeds of sale, except those approved by Buyer.

4.     Excluded Assets.  The term "**Excluded Assets**" means the following assets of Seller, all of which are excluded from the purchase and sale transaction provided for in this Agreement:

> 4.1    the Purchase Price and all cash, cash equivalents, bank accounts or similar types of investments, such as certificates of deposit, treasury bills and other marketable securities;

> 4.2    all tax returns and all tax credits, tax benefits and claims for refunds in respect of any federal, state, local, and/or foreign income, gross receipts, capital stock, profits, withholding, unemployment, disability, real estate, personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, severance, estimated or other taxes, including any interest or addition thereto, for periods ending on or before the Closing Date;

2

4.3    subject to Section 15, any and all right, title and interest in any insurance policy(ies) in connection with the ownership or operation of the Real Property by the Seller and/or the Debtor and any and all amounts claimed and/or collected pursuant to such insurance policy(ies);

4.4    all rights and properties not owned by the Debtor;

4.5    all items of personal property located at the Real Property;

4.6    the membership interests and any other ownership interests in the Debtor, and the company minute books, transfer records, and all other company documents of Debtor;

4.7    all contract rights, rights of action, claims for damages, rights of setoff, rights of recoupment, claims, demands, actions, causes of action, judgments, and pending litigation;

4.8    all rights, claims, defenses and other matters that relate to any construction contracts affecting the Property; notwithstanding anything herein to the contrary, any construction defect or related claims which arose prior to Closing shall be an Excluded Asset;

4.9    all rights, claims, causes of action, defenses and other matters that relate or belong to the Debtor and/or the Seller, including without limitation and any claims, or causes of action which are property of the estate under section 541 of the Bankruptcy Code including those arising under or in connection with Chapter 5 of the Bankruptcy Code;

4.10    any prepaid expenses, advance payments, security deposits, rents and other items related to the Assets that are applicable to the period prior to Closing, or that relate to executory contracts or unexpired leases;

4.11    the Debtor's accounts receivable; and

4.12    any asset not specifically included in the definition of "Assets".

5.    <u>Deposit</u>.

5.1    Upon execution of this Agreement by the last of Buyer and Seller, Buyer shall have deposited the sum of ONE HUNDRED THOUSAND AND 00/100 DOLLARS (<u>$100,000.00</u>) of the Purchase Price with Seller's Counsel, Dunn Law, P.A. (the "**Deposit Agent**"), in the form of a wire transfer payable to Deposit Agent, in escrow, as Buyer's initial deposit under this Agreement (the "**Initial Deposit**").

5.2    Within twenty-four (24) hours of the conclusion of the Auction at which Buyer is determined to be the Successful Bidder or the Backup Bidder,

3

Buyer supplement the Initial Deposit by an amount such that the supplemented deposit equals ten (10%) percent of the Purchase Price including the Buyer's Premium (defined herein) (the "**Supplemental Deposit**"). The Initial Deposit and the Supplemental Deposit are collectively referred to herein as the "**Deposit**". The Deposit shall be held without interest and shall be applied against the Purchase Price at Closing, or returned to Buyer if this Agreement is not approved by the Bankruptcy Court, or paid to Seller in the event of Buyer's unexcused failure to perform its obligations at Closing.

5.3    If all of the contingencies set forth in Section 8 are satisfied or waived in writing by Buyer, and Seller then fails, after the entry of the Sale Order, to close on the sale of the Property to Buyer as required by this Agreement, Buyer shall be entitled to a refund of the Deposit, as its sole and exclusive remedy and as liquidated damages for Seller's failure to close.

6.    <u>Purchase Price</u>.  The purchase price for the Assets shall be <u>$3,000,000.00</u> (the "**Purchase Price**").  At the Closing, Buyer shall pay to Seller the Purchase Price, plus or minus the net amount of any prorations provided for in Section 11, by wire transfer of immediately available funds to such account(s) as Seller shall designate.

7.    <u>Bankruptcy Court Approval, Competing Transactions, Backup Bid and Buyer's Premium</u>.

7.1    <u>Bankruptcy Court Approval</u>.  Seller shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the sale of the Assets to Buyer pursuant to this Agreement (the "**Sale Order**"), which shall contain the following provisions:

(a)    a finding that Seller prepared and served a motion seeking the Sale Order, and such motion and notice were proper and sufficient as to all parties entitled to same;

(b)    the sale and transfer of the Assets to the Buyer is approved pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code;

(c)    the sale of the Assets to Buyer pursuant to this Agreement will be free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens, attaching to the sale proceeds;

(d)    Buyer is not a mere continuation of Seller or Debtor, there is no continuity of enterprise between Seller or the Debtor and Buyer, Buyer is not a successor to Seller or the Debtor and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or *de facto* merger of Buyer and Seller or the Debtor;

4

(e)     Buyer has acted in good faith within the context of and is entitled to the protections of Section 363(m) of the Bankruptcy Code;

(f)     the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code;

(g)     Buyer is not assuming or acquiring any of the Excluded Assets and;

(h)     all Persons are enjoined from in any way pursuing Buyer or the Assets by suit or otherwise to recover on any Liens which they may have against Debtor or the Assets as of the Closing Date.

7.2.    <u>Competing Transaction</u>.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids other than from Buyer pursuant to procedures approved by the Bankruptcy Court (each a "**Competing Bid**").  From the date hereof (and any prior time) and until the completion of the auction contemplated hereby or as otherwise directed by the Bankruptcy Court, Seller is permitted to cause his respective representatives to initiate contact with, solicit or encourage submission of any inquiries proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Assets.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Assets to prospective buyers.

7.3.    <u>Backup Bid.</u>  In the event any Person other than Buyer is either the successful bidder at the conclusion of the Auction or the Bankruptcy Court has entered a Final Sale Order approving the sale of all or substantially all of the Assets to any Person other than Buyer, Buyer shall be deemed a backup bidder (the "**Backup Bidder**") and this Agreement shall be enforceable until a Closing with a Person other than Buyer shall occur. Accordingly, in accordance with this Section 7.3 and Section 5.1, the Deposit Escrow Agent shall retain the Deposit and not refund to Buyer until a Closing takes place with a Person other than Buyer.

7.4.    <u>Buyer's Premium.</u>  In addition to its Purchase Price, the Buyer shall pay a "Buyer's Premium" equal to six percent (6%) of the Purchase Price (the "**Buyer's Premium**"), to be paid at the closing of the sale to the Trustee's retained broker/auctioneer, Fisher Auction Company.

7.5     <u>Break-Up Fee.</u>  In the event Buyer is not in default and has not terminated this Agreement pursuant to the terms hereof and is ready, willing, and able to close on the purchase of the Assets, and should Seller accept a higher or

5

better offer to sell the Assets to another Buyer ("**Alternative Buyer**"), which sale is approved by the Bankruptcy Court in the Bankruptcy Case, and such transaction closes, then Seller agrees that Buyer shall be entitled to receive $60,000.00 as a break-up fee to reimburse Buyer for the value of its time, costs, and expenses incurred in connection with this transaction, including Buyer's agreement to serve and participate as the "stalking horse" bidder under the Sale Procedures Order (the "**Break-Up Fee**"). The Break-Up Fee shall be entitled to status as an administrative expense under Bankruptcy Code Section 503(b)(1), shall be secured by a lien on the deposit of the Alternative Buyer or the closing proceeds in the event the transaction with the Alternative Buyer closes, and shall be paid solely and exclusively from such forfeited deposit or closing proceeds. Any sums becoming payable to Buyer pursuant to this Section 7.5 shall be paid to Buyer promptly after the closing with any such Alternative Buyer occurs.

8.    <u>Conditions to Obligations of Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before Closing of each and every one of the following conditions, which may be waived in whole or in part by Buyer:

8.1    the Sale Order shall have been entered by the Bankruptcy Court, and the Sale Order shall contain findings set forth in Section 7 above; and

8.2    the representations and warranties of Seller shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Seller shall not be in default in any material respect under the provisions of this Agreement.

8.3    If any of the foregoing conditions is not satisfied by Seller or waived by Buyer before or at the Closing, Buyer may terminate this Agreement and Seller shall forthwith return the Deposit to the Buyer, and neither Party shall have any further obligations to the other, other than under Section 16 and any other provision of this Agreement that expressly provides for such survival.

9.    <u>Conditions to Obligations of Seller</u>.  The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or before the Closing of the following conditions, which may be waived in whole or in part, by Seller:

9.1    the Sale Order shall have been entered by the Bankruptcy Court;

9.2    the representations and warranties of Buyer shall be true in all material respects on and as of the Closing Date, with the same effect as though made on and as of such date, and Buyer shall not be in default in any material respect under the provisions of this Agreement; and

6

9.3  Buyer shall have paid to Seller the Purchase Price and paid or escrowed the other amounts required by this Agreement to be paid or escrowed at Closing.

10.  <u>Closing</u>.

10.1  Unless otherwise agreed to by the Seller and Buyer in writing, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place on or before ten (10) calendar days after the Sale Order is final and not subject to appeal (the "**Closing Date**"). The Seller and Buyer may agree in writing to proceed to Closing at an earlier date provided that the Sale Order contains a waiver of the 14-day stay period in accordance with Fed. R. Bank. P. 6004(h). Notwithstanding anything herein to the contrary, if the Sale Order has been stayed by an order of a court of competent jurisdiction, then the Closing Date shall be postponed until not more than five (5) business days after the stay has been finally dissolved. If such postponement is longer than 120 days, Buyer and Seller shall each have the right to terminate this Agreement by giving written termination notice to the other, in which case neither Party shall have any further obligations under this Agreement except those that expressly survive the termination of this Agreement.

10.2  Closing shall be conducted through an escrow arrangement by the title insurance agent (to be designated by the Seller) and through which Buyer shall purchase title insurance for the Property (the "**Closing Agent**"). Closing shall take place at the offices of Dunn Law, P.A. (or such other place as the parties may designate in writing). Each Party shall deliver written closing instructions to the Closing Agent consistent with the provisions of this Agreement.

10.3  At the Closing, Seller shall deliver to Buyer:

(a)  the transfer instruments provided for in Section 3; and

(b)  such other documents as Buyer may reasonably request to consummate the transaction provided for in this Agreement.

10.4  At the Closing, Buyer shall deliver to Seller:

(a)  the Purchase Price as provided in Section 6;

(b)  the transfer instruments provided for in Section 3;

(c)  the Buyer's Premium as provided for in Section 7.4; and

(d)  such other documents as Seller may reasonably request to consummate the transaction provided for in this Agreement.

10.5  Buyer shall pay, on the Closing Date, the cost of recording the deed and the cost of the issuance of the title insurance policy premium for any owner's

7

title insurance policy (and any loan policy) obtained by Buyer or its lender (if applicable), the cost of all title updates, title examination, and lien searches, and the cost of any inspections and/or surveys, any settlement fees charged by the Person conducting the Closing, state documentary stamps which are required to be affixed to the instrument of conveyance, the cost of recording any corrective documents, the cost of recording of the deed and all other costs and charges of Closing.  Each Party shall pay its own attorneys' and other professionals' fees.

11.    <u>Prorations</u>.

11.1    Real property taxes and assessments for the tax year in which the Closing occurs, all utility bills, and any requirements to comply with state or local codes including fines shall be apportioned between Buyer and Seller as of the Closing Date.  If final documentation of any such item is not available at the Closing, the required proration shall be made on the basis of the best available documentation and a further proration shall be made between the parties when the final documentation or billing becomes available, provided that if the final documentation or billing is not available within 30 days after the Closing, then no further proration shall be made.  The provisions of this Section 11 shall survive the Closing.

11.2    The parties agree that, after the Closing Date, each shall hold and shall promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements or other property that they may receive on or after the Closing Date which properly belong to the other Party, including any insurance proceeds, and shall account to the other for all such receipts.

12.    <u>Representations and Warranties of Seller</u>.  Trustee represents and warrants to Buyer that Trustee is the duly appointed Chapter 7 Trustee for the Debtor, and that, subject to the entry of the Sale Order without any stay being obtained by any party in interest within the requisite period, Trustee has the power to convey the Assets to Buyer pursuant to this Agreement and subject to and in accordance with the provisions of the Sale Order.

13.    <u>Representations and Warranties of Buyer</u>.  Buyer hereby represents and warrants to Seller, which representations and warranties shall survive Closing, as follows:

13.1    At the time of closing, Buyer will be a limited liability company duly organized and validly existing under the laws of the State of Florida.

13.2    The execution, delivery and performance by Buyer of this Agreement and the other documents and instruments contemplated hereby are within the power of Buyer and have been duly authorized by all necessary action by Buyer.  This Agreement is, and the other documents and instruments contemplated hereby will be, when executed and delivered by Buyer, the

8

valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

13.3    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result in a violation by Buyer of any federal, state, local or other law or governmental requirement of any kind, nor any rules, regulations, permits, licenses and orders promulgated thereunder.

13.4    **BUYER, ON BEHALF OF ITSELF AND ANY AFFILIATES OR RELATED PARTIES, UNDERSTANDS AND AGREES THAT THE ASSETS ARE SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO BUYER IN "AS IS" CONDITION ON A "WHERE IS" BASIS, WITH NO CONTINGENCIES OF ANY KIND INCLUDING FINANCING OR DUE DILIGENCE AND WITHOUT ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT**.

14.    <u>Default and Remedies</u>.

14.1    If the Closing fails to occur because of a default, misrepresentation or breach of warranty by Buyer, Seller shall be entitled to retain the Deposit as Seller's sole remedy at law or in equity for Buyer's failure to close on the purchase of the Property.  In any such event, Buyer shall continue to be liable under any provisions of this Agreement that expressly survive the termination of this Agreement.

14.2    If the Closing fails to occur solely because of a default by Seller under the provisions of this Agreement, the Sale Order or any other order of the Bankruptcy Court applicable to the sale of the Property hereunder, then Buyer may, as its exclusive remedy, receive a return of its Deposit and terminate this Agreement by notice to Seller.

15.    <u>Risk of Loss</u>.  Risk of loss to the Real Property or any part thereof from damage or destruction by fire or other casualty or by reason of condemnation shall remain upon Seller until the Closing.  If, between the date hereof and the Closing, any portion of the Real Property shall be damaged or destroyed by fire or other casualty or be subject to any claim of condemnation, Seller shall notify Buyer in writing of said damage, destruction, casualty or loss and the extent thereof or of such condemnation claim as the case may be.  If the cost to repair any such damage exceeds $500,000 or in the event of any such claim for condemnation, Buyer shall have the option, exercisable by notice to Seller given within ten days after Seller's notice to Buyer of said damage, destruction, casualty, loss or condemnation, to either:  (a) terminate this Agreement, whereupon Deposit Agent shall forthwith refund the Deposit to Buyer and upon such refund this Agreement shall terminate and neither party shall have any further liability to the other hereunder (except for

any rights and obligations arising under this Agreement which by their terms survive such termination); or (b) elect to proceed with this Agreement and pay the full Purchase Price, in which case Seller shall assign to Buyer any insurance or condemnation proceeds to which Seller or its successors may be entitled as a result of such damage, destruction, condemnation, loss or casualty without Seller replacing or repairing any such damage.  If Buyer fails to give such written notice, Buyer shall be conclusively deemed to have chosen option (b).  If the cost to repair any such damage is equal to or less than $500,000, Buyer shall proceed to Closing, in which event Seller agrees to pay to Buyer at the Closing all insurance or condemnation proceeds which Seller has received as a result of the same, if any, and assign to Buyer all insurance proceeds payable as a result of the same without Seller replacing or repairing such damage, and Seller will have no further obligations to Buyer in respect of such loss or damage.

16.    <u>No Claims of Brokers.</u>  Seller shall not be responsible for any broker's commissions. Buyer shall indemnify and hold the Seller harmless from the claims of any other broker or finder claiming through the Buyer.  The provisions of this Section shall survive the Closing and any termination of this Agreement.

17.    <u>Further Assurances</u>.  Each Party shall cooperate with the other and execute and deliver to the other Party such other instruments and documents and take such other actions as may be reasonably requested from time to time by the other Party as necessary to carry out, evidence, and confirm the intended purposes of this Agreement.

18.    <u>Deposit Agent Provisions</u>.

18.1    If conflicting demands relating to this Agreement are made upon the Deposit Agent, the parties hereto expressly agree that the Deposit Agent shall have the absolute right to do either or both of the following: (i) withhold and stop all actions in performance of this escrow and await settlement of the controversy by final appropriate legal proceedings or as otherwise mutually directed in writing by Buyer and Seller; or (ii) file suit in declaratory relief or interpleader and obtain an order from the Bankruptcy Court requiring the parties to interplead and litigate in such court their several claims and rights amongst themselves.  Upon the filing of any such declaratory relief or interpleader suit and depositing with the Bankruptcy Court all funds deposited by the parties under this Agreement, the Deposit Agent shall thereupon be fully released and discharged from any and all obligations to further perform the duties or obligations imposed upon it by this Agreement.

18.2    In no event shall Deposit Agent be liable for any act or omission under or in respect of this Agreement except where Deposit Agent's acts or omission is the result of its gross negligence or willful misconduct.  Accordingly, Deposit Agent shall not incur any liability with respect to (i) any action taken or omitted in good faith, including upon advice of its legal counsel given with respect to any questions relating to the duties and responsibilities of the Deposit Agent under this Agreement, or (ii) any action taken or

omitted in reliance on any instrument, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and accuracy of any information contained therein, which Deposit Agent shall in good faith believe to be genuine, to have been signed or presented by a person or persons having authority to sign or present such instrument, and to conform with the provisions of this Agreement.

18.3    Buyer and Seller reserve the right, at any time and from time to time, by mutual agreement, to substitute a new escrow agent in place of Deposit Agent.  In addition, Deposit Agent reserves the right to resign from its role as escrow agent by giving the Seller and the Buyer written notice of such resignation.  If Seller and Buyer have jointly designated a successor escrow agent in writing, then Deposit Agent shall deliver any funds held by Deposit Agent under this Agreement to such successor escrow agent.  However, if no such successor escrow agent is designated by Seller and Buyer in writing within ten days after any notice of resignation from Deposit Agent, then Deposit Agent may deliver any such funds to the Bankruptcy Court, and interplead Buyer and Seller in connection therewith.

18.4    Seller acknowledges that Deposit Agent also serves as Seller's legal counsel in connection with this Agreement, and both Seller and Buyer consent to Deposit Agent serving in such dual capacity.  In the event of any actual dispute or adversity between Seller and Buyer, Deposit Agent shall be entitled to resign as Deposit Agent and to represent Seller in such dispute or adversity, and in such case shall deliver any funds held by Deposit Agent pursuant to this Agreement the funds either to a successor escrow agent designated by Seller and Buyer as provided above, or to a court of competent jurisdiction as provided for above.

19.    <u>Miscellaneous</u>.

19.1    This Agreement and the Schedules to this Agreement may not be amended except by an instrument in writing signed on behalf of each Party.

19.2    This Agreement, together with the Schedules and other agreements referred to in this Agreement, constitute the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the Parties regarding such subject matter.

19.3    All notices and other communications under this Agreement shall be in writing and shall deemed given if delivered personally or mailed by registered or certified mail, postage prepaid, return receipt requested (such mailed notice to be effective on the date such receipt is acknowledged) or

delivered by a recognized overnight delivery system (such overnight notice to be effective on the date of receipt) as follows:

If to Buyer, addressed to:

Grieco Chevrolet Fort Lauderdale LLC
attn:  Michael A. Grieco, Jr.
1300 N Federal Hwy
Fort Lauderdale FL 33304

With a copy to:
Joshua Teverow, Esquire
Joshua Teverow, Esquire, Ltd.
55 Pine Street
Providence, RI 02903
Phone:  401-272-2901
Mobile:  401-641-2900
Email:  Teverowlaw@aol.com

If to Seller, addressed to:

Sonya S. Slott, Trustee
PO Box 15580
Plantation, FL 33318
Email:  sonya@msbankrupt.com

With a copy to:

Zachary Malnik, Esq.
The Salkin Law Firm P.A.
PO Box 15580
Plantation, FL 33318
Email:  zachary@msbankrupt.com

or to such other place and with such other copies as either Party may designate as to itself by written notice to the others.

19.4    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

19.5    This Agreement shall not be recorded by Buyer and, if recorded by Buyer, Seller may immediately terminate all of its obligations under this Agreement, and Buyer shall pay Seller's Legal Costs in removing this Agreement of record. The provisions of this Section 19.5 shall survive the Closing.

19.6    If the last day of any time period provided for in this Agreement falls on a Saturday, Sunday or holiday, the last day shall be extended until the next business day that banks operating in Miami, Florida are open for business, but in no case will the extension be for more than three days.  For purposes of this Agreement, "business day" shall mean any day other than a Saturday, a Sunday, or any other day on which banking institutions in Miami, Florida, are closed or are authorized to be closed, including all legal holidays.

19.7    The rights and obligations of Buyer hereunder may be assigned to one or more affiliated entities without the consent of Seller, and to any unaffiliated third party with the prior written consent of Seller.  No assignment under this provision shall relieve Buyer of liability to Seller for amounts accruing

under this Agreement.  This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the parties hereto. The Parties neither intend to confer any benefit hereunder on any Person other than the parties hereto, or shall any such third party have any rights hereunder.

19.8    This Agreement shall be governed by, construed, interpreted and the rights of the Parties determined in accordance with the laws of the State of Florida without reference to its choice or conflicts of laws principles.  Each Party: (i) irrevocably submits to the jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party; and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement.

19.9    BUYER AND SELLER HEREBY EACH WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS AGREEMENT.

WITNESS the following signatures as of the date in the preamble.

BUYER:

Grieco Chevrolet Fort Lauderdale LLC , a Florida Limited Liability Company

By:  Michael A. Grieco, Jr., Authorized Agent

Date:  October 18 , 2022

SELLER:

Sonya S. Slott, as Chapter 7 Trustee of No Rust Rebar, Inc.

Date: October 18 , 2022

13

## EXHIBIT A

## LEGAL DESCRIPTION

Lots 8A, 9, 10 and 11 in EAST COAST INDUSTRIAL CENTER, according to the Plat thereof as recorded in Plat Book 63, Page 30, of the Public Records of Broward County, Florida.

Tax ID # 4842 24 27 0120;